UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM DIAZ,

          Plaintiff(s),        CASE NUMBER: 05-70928
                                       HONORABLE VICTORIA A. ROBERTS

v.

ANTHONY ROMITA, et al.,

          Defendant(s).
_____/

ORDER GRANTING IN PART AND DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons stated below, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

**II.    BACKGROUND**

Plaintiff William Diaz brings this action for injuries he allegedly suffered while an inmate at the Macomb County Jail. Defendants Anthony Romita, Brian Sywak and Eric Oke were Corrections Officers at the jail.

At approximately 9:40 p.m. on October 27, 2004, Romita was working in the "Tower" for the 8th and 9th floors. The Tower is a control booth that is enclosed in glass and situated in the center of the cells on the 8th and 9th floors such that an officer in the booth can observe all of the cells on those floors. From the Tower, Romita could electronically control the doors leading into the cell areas and the individual cells.

1

While he was in the Tower, Romita says that he ordered the inmates in area "D" on the 8th and 9th floors to "lock down" because of excessive noise. The inmates were to go to their assigned cells and lock the doors. Plaintiff's cell was on the 8th floor. Romita said he issued the lock down order three times, but the inmates did not comply. So, when Oke and Sywak came to relieve Romita for a break, Romita and Sywak went to enforce the lock down order. Oke took over control of the Tower and overrode the doors to the area so that Romita and Sywak could enter area "D." Romita said the inmates complied with his order after he and Sywak entered the area. He says that he and Sywak then took the television (because it was loud and causing a disturbance) and left without incident. Oke corroborates their claim.

Plaintiff gives a very different account. Plaintiff heard Romita's announcement over the intercom, but was unsure about whether he ordered area "D" or "E" to lock down. When the announcement was made Plaintiff was in his cell playing cards with his cellmate, Ulius Dubard, and two other inmates. Plaintiff stepped outside the cell to find out if the order was directed at his area. Romita repeated the order, but Plaintiff says that he and other inmates sitting in the common area did not believe that Romita was talking to them. Then, Plaintiff heard the outer doors open and saw Romita and Sywak enter. Plaintiff says Romita yelled at the inmates and stated: "[Y]ou motherfuckers want to act like animals, I'm going to treat you like animals. Lock the fuck down." Pl. Exh. 2, Pl. Dep. at p. 62.

As Plaintiff headed into his room, he says that Romita stopped at his cell, ordered him inside, and whispered in Plaintiff's ear something to the effect "you better make sure that door is slammed up your ass." Pl. Exh. 2 at 65. Plaintiff says that

2

Romita pushed another inmate who was leaving Plaintiff's cell, slammed the door shut and ordered Plaintiff to get on his bunk. Plaintiff's cell door automatically locked. Shortly thereafter, Romita and Sywak left "D" area with the television.

Plaintiff and Dubard then talked about what occurred. Plaintiff either said that Romita would get his ass kicked if he (Romita) was not in the jail, or that he (Plaintiff) would "beat his (Romita's) ass" if he (Plaintiff) was on the street. Pl. Exhs. 2 at 77-78; Exh. 5, Dubard Dep. at p. 50. According to an investigative report prepared by Detective/Sergeant Daniel Willis, within one minute after they left, Oke asked Romita and Sywak to return to area "D," purportedly because several cell doors appeared to be unlocked. Def. Exh. F.

Plaintiff says that when Romita and Sywak returned, he heard the lock on his cell open. He and Dubard stood up. Romita opened Plaintiff's door. He said, "Which one of you motherfuckers say you going to kick my ass?" Exh. 2 p. 81-85. It is unclear how the officers heard Plaintiff's comments. Plaintiff believes that officers in the Tower can listen in on conversations in the cells. Dubard was standing by the doorway. Plaintiff says Romita pushed Dubard towards the bunk and grabbed Plaintiff by the back of the neck. Sywak grabbed Dubard, took him out of the cell, and instructed him to sit at a nearby table. At some point, Plaintiff says that Romita turned him around so that he was facing away from Romita, grabbed Plaintiff by the throat, and grabbed Plaintiff's left hand. Sywak returned to Plaintiff's cell and grabbed Plaintiff's right arm. Plaintiff says that he protested, but did not resist.

Plaintiff said that he assumed that the officers were planning to handcuff him behind his back, so he tried to assume the position and asked the officers if they were

3

handcuffing him. He says that Romita said "no." Romita and Sywak pushed Plaintiff's hands above his head. When Plaintiff turned and began to say something to Sywak, he says Romita punched him four times on the lower left side of his back, near his kidney. As Plaintiff doubled over, he says Romita thrust his knee into Plaintiff's stomach/hip area twice. The officers were still holding Plaintiff's arms. Romita then began throwing punches towards Plaintiff's face. Plaintiff was able to deflect the first punch with his left shoulder, but a second punch landed on the back of Plaintiff's head.

While still holding Plaintiff's arms, Plaintiff says that Romita and Sywak flipped him over into one of the bunks. In the process, Plaintiff hit his head on the bed's metal frame, briefly dazing him. Romita directed Plaintiff to lay his head flat on the bead. When Plaintiff moved his head to look at the officers, Plaintiff says that Romita grabbed his head and pushed his face into the bed and forcefully held it there for 30 to 45 seconds in the position he indicated that he wanted Plaintiff to remain. After Romita released him, Plaintiff says that Romita threw some of Plaintiff's things around the room and Sywak brought Dubard back into the cell. The officers shut the door and left area "D."

After the alleged assault, Plaintiff said that he had pain in his back, head, shoulder and hip. The pain was so severe that he could not sit or lay down; he just stood. But, Plaintiff did not report the incident immediately because he was afraid to do so while Romita and Sywak were still on the shift. After shift change, which occurred at approximately midnight, Plaintiff says that he reported the assault to the first officer who made rounds and requested medical care.

After an hour, Plaintiff was taken to the nurse, Phyllis Muro. He said the nurse

laughed and made light of his situation. After the exam, Muro gave Plaintiff two Motrin pills. Plaintiff was then taken to the Shift Commander, Sergeant Gregory Switchulis. After Plaintiff relayed the incident to Sergeant Switchulis, he said that Switchulis reacted in a hostile manner, but gave Plaintiff a form to complete if he wanted to press charges.

Plaintiff's alleged injuries were photographed later that morning. In his investigative report, Sergeant Willis indicates that there were no visible marks on Plaintiff's neck or head, but that Plaintiff had minor swelling on the left side of his back. Def. Exh. F.

Defendants Romita and Sywak deny entering Plaintiff's cell or assaulting him. Oke also denies witnessing an altercation or opening Plaintiff's cell door. However, Sergeant Switchulis indicates in his report that he passed out statement forms to the entire "D" area on floors 8 and 9. Out of 27 statements, 14 inmates reported either witnessing or hearing what appeared to be an altercation between two officers and an inmate.

Also, several inmates gave testimony which corroborates Plaintiff's claim: 1) Dubard sat outside the cell at a distance of 10 to 12 feet and says he saw the alleged attack. His testimony is consistent with Plaintiff's. 2) Timothy Manning, who was in a nearby cell, testified that two officers went to Plaintiff's cell (Oke and another officer, per Manning) and directed Dubard to sit outside. Manning could not see anything else but heard banging and yelling in Plaintiff's cell. 3) Anthony Moore was in the cell next to Plaintiff's. He also heard an officer send one of the inmates in Plaintiff's cell out and a scuffle in cell thereafter. 4) Randall Hough, who was briefly standing in an area outside of his cell that allowed him to see into Plaintiff's cell, identified Romita and Sywak as the

5

officers who entered Plaintiff's cell. Hough says he saw Romita punch Plaintiff multiple times. 5) Jason LaRose was in area "D" at the time of the alleged assault. He initially gave a statement saying that he did not see anything. However, he later told Sergeant John Rollo, who was assigned to investigate, that he denied seeing anything because he did not want to appear to be a "rat," *i.e.,* snitch, and because he was in jail on a criminal sexual assault charge and had been threatened by the entire 8/9 "D" unit. (It is not clear if he was referring to the officers or inmates on the 8/9 unit.). LaRose, like Manning, told Sergeant Rollo that he only heard what sounded like an assault in Plaintiff's cell. At his deposition, however, LaRose gave a third account stating that he saw an officer beating Plaintiff and that he heard the officer call Plaintiff a "nigger" while doing so. During his deposition, LaRose said that he did not tell Sergeant Rollo that he saw the assault because he felt threatened. (Because Plaintiff did not attach the deposition pages including this entire line of questioning, it is unclear by whom LaRose felt threatened.).

The Macomb County Sheriff's Department initiated internal and criminal investigations. The Sheriff's Department found that Plaintiff's allegations were without merit. The Federal Bureau of Investigation also investigated the incident, but found that there were no identifiable injuries (the photographs do not clearly show physical injuries) and that the witnesses lacked credibility.

This action alleges: Count I--assault and battery; Count II--concert of action; Count III--civil conspiracy; Count IV--intentional infliction of emotional distress ("IIED");

Count V--violation of the Eighth Amendment;[1] and, Count VI--conspiracy in violation of 42 U.S.C. §1985.

Defendants move for summary judgment on all claims.

### III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet

---

[1] In the alternative, Plaintiff also pled violation of the Fourteenth Amendment in the event Plaintiff was considered a pre-trial detainee, rather than a post-trial detainee. In Defendants' motion and Plaintiff's response, it is apparent that the parties proceed on the presumption that Plaintiff is a post-trial detainee and, therefore, that the Eighth rather than Fourteenth Amendment applies to his claim.  The Court proceeds on the same presumption.

this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

IV.    **APPLICABLE LAW AND ANALYSIS**

    A.    **FEDERAL CLAIMS**

        i.    **42 U.S.C. §1983--Excessive Force (Count V)**

The Eighth Amendment proscribes the infliction of cruel and unusual punishment upon inmates. Plaintiff alleges that Defendants' excessive use of force deprived him of his Eighth Amendment rights in violation of 42 U.S.C. § 1983.

Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"To state a cause of action under §1983, a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law." *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir. 2003). Here, Defendants do not dispute that they were acting under color of law, and Plaintiff has presented *prima facie* evidence to sustain his Eighth Amendment claim against Defendants Romita and Sywak.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v McMillian,* 503 U.S. 1, 6 (1992). Courts recognize that "maintenance of prison security and discipline may often require that prisoners be subjected to physical contact which at common law would be actionable as an assault." *Pelfrey v Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995). However, contact which reflects "an unnecessary and wanton infliction of pain" violates the Eighth Amendment. *Id*; *Combs v Wilkinson,* 315 F.3d 548, 556 (6th Cir. 2002). Factors to consider in determining whether a use of force was "unnecessary and wanton" include: 1) the extent of injury suffered by an inmate; 2) the need for application of force; 3) the relationship between that need and the amount of

9

force used; 4) the threat reasonably perceived by the responsible officials; and 5) any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7.

Accepting Plaintiff's version of the facts as true, there is no evidence that the use of force against him was done in furtherance of a good faith effort to maintain or restore discipline. Plaintiff testified that Romita, with Sywak's assistance, beat him without provocation. His claim is corroborated by the deposition testimony of three eyewitnesses who claim to have seen the assault. Also, one investigative report noted minor swelling of the left side of Plaintiff's back. Defendants only counter Plaintiff's evidence with denials. This conflict in the evidence indisputably raises a question of fact.

Defendants argue that summary judgment is, nevertheless, warranted because there is no evidence that Plaintiff suffered more than minor injuries, which they say weighs against his credibility. In support of this assertion Defendants cite two unpublished Sixth Circuit opinions: *Reist v Orr*, 67 F.3d 300 (6th Cir. 1995) and *Lince v Youngert*, 136 Fed. Appx. 779 (6th Cir. 2005). Both cases are inapposite.

In *Reist*, plaintiff alleged that three corrections officers used excessive force against him while returning him to his cell. He said that the use of force resulted in injury to his neck and lower back. He also alleged that a fourth officer participated by opening his cell door to allow the other three officers to enter. The district court granted defendants motion for summary judgment; there was no support for Plaintiff's claim that an excessive amount of force was used against him except his own statement. In contrast, the district court said that defendants presented "a barrage" of unrefuted evidence contrary to plaintiff's claim which included medical evidence, incident reports,

10

and the witnesses, documents and evidence presented at plaintiff's major misconduct hearings. The Sixth Circuit affirmed. The *Reist* court acknowledged that an Eighth amendment claim is not precluded in the absence of a serious injury. *See Hudson,* 503 U.S. at 7. But, it characterized Plaintiff's injuries as extremely minor and held that plaintiff's "self-serving statement [did] not sustain his burden of proof in light of the overwhelming evidence submitted by the defendants that *minimal force* was used to control an unruly prisoner." 67 F.3d at *3 (emphasis added).

Here, it is the Defendants who have not offered any evidence beyond their own self-serving statements. In contrast, in support of his claim that more than minimal force was used by Defendants, Plaintiff offers: 1) his own testimony and that of three eyewitnesses; and 2) internal investigative reports which indicate that a total of 14 witnesses claimed to have seen or heard an altercation between two officers and an inmate, and that swelling was noted on the left side of Plaintiff's back.

*Lince* is, likewise, distinguishable. In *Lince*, plaintiff alleged that the defendant officer repeatedly punched him in his stomach and groin while plaintiff was chained to a bed by his arms, legs and torso (as a disciplinary measure). Plaintiff claimed that he suffered bruises and swelling in his groin and stomach area. But, no injuries were visible and plaintiff did not mention his stomach or groin to the nurse who examined him shortly after the alleged assault.

Following a bench trial, the trial court rendered a verdict in favor of defendant. In finding that plaintiff did not prove by a preponderance that defendant assaulted him, the court relied in part on the fact that there was no evidence to corroborate plaintiff's alleged injuries. Plaintiff appealed the judgment and the trial court denied his motion for

a new trial. Plaintiff argued that the district court applied an erroneous legal standard by requiring him to present evidence of physical injury to prove an Eighth Amendment violation.

The Sixth Circuit reviewed the district court's verdict under a clearly erroneous standard and affirmed. The Circuit acknowledged that requiring an inmate to prove a serious physical injury in order to establish an Eighth Amendment violation would be erroneous. An inmate is only required to prove that the infliction of pain from use of force was unnecessary and wanton. However, the *Lince* Court pointed out that the district court, in fact, did not impose a serious injury requirement. Rather, the district court viewed plaintiff's lack of injuries as one factor which weighed against his claim that an assault actually occurred.

Unlike the district court in *Lince*, which was the trier of fact, this Court is not at liberty at this stage of the proceedings to weigh Plaintiff's credibility. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A genuine issue exists for trial if the nonmoving party sets forth sufficient evidence for a jury to rule in his favor. *Id.* As outlined above, Plaintiff met this burden. Therefore, Defendants Romita and Sywak's motion for summary judgment is denied. To the extent this claim is also alleged against Defendant Oke, however, there is no evidence that he used any force against Plaintiff. Therefore, Defendant Oke's motion for summary judgment is granted.

### ii.     42 U.S.C. §1985--Conspiracy (Count VI)

Plaintiff alleges that all of the Defendants conspired to deprive him of equal

protection of the law in violation of 42 U.S.C. §1985(3). To state a claim under §1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Vakilian v Shaw*, 335 F.3d 509, 518 (6th Cir. 2003). "The acts which are alleged to have deprived the plaintiff of equal protection must be the result of class-based discrimination." *Id* at 518-519.

Plaintiff presented ample evidence from which reasonable jurors could find that Defendants acted in concert to assault Plaintiff, committed acts in furtherance of their plan, and that Plaintiff suffered injury as a result. There is evidence that Romita and Sywak entered the "D" area a second time at Oke's request, went directly to Plaintiff's cell, entered together, and forcefully restrained both Plaintiff and Dubard. Sywak then ushered Dubard out and returned to assist Romita in restraining Plaintiff while Romita beat him. Plaintiff testified that he experienced severe pain to his back, head, shoulder and hip as a result.

Although Oke did not enter Plaintiff's cell or use force against him, there is evidence from which reasonable jurors could find that Oke participated by unlocking the doors leading into "D" area and Plaintiff's cell to allow Romita and Sywak access. It is undisputed that Oke was in the Tower with control over the electronic locking system for the entire "D" area, including inmate cells. Oke admitted during an internal investigation that he opened the outer doors leading to the "D" area so that Romita and Sywak could

enter a second time.  And, although Oke denies unlocking Plaintiff's cell, his denial is rebutted by Plaintiff and Dubard's testimony that they heard their door unlock electronically when Romita and Sywak returned.

Finally, there is evidence that Defendants' alleged actions were motivated by racial animus.  Defendants are Caucasian.  Plaintiff is African-American.  Inmate LaRose testified that he heard one of the officers call Plaintiff a "nigger" while beating him.  Defendants argue that LaRose's testimony is not credible because he initially gave a statement denying that he saw anything, and he failed to mention the racial slur when interviewed by Sergeant Rollo.  However, LaRose indicated in his first statement that he would speak privately, despite his assertion that he did not see anything.  When approached privately by Sergeant Rollo, he indicated that he only denied knowledge of the alleged assault out of fear of retaliation.  He, likewise, claimed in his deposition that he still was not fully forthcoming with Sergeant Rollo because he was afraid.  In any event, the conflicts between LaRose's statements go only to the weight the trier of fact should give his testimony.  As stated, the Court is not at liberty to weigh credibility at this juncture.  The Court must credit LaRose's statements in the light most favorable to Plaintiff for the purpose of summary judgment.

For these reasons, Defendants' motion for summary judgment is denied.

**B.     STATE LAW CLAIMS**

Defendants assert, as a preliminary matter, that they are entitled to governmental immunity on Plaintiff's intentional tort claims of assault and battery and IIED, pursuant to Michigan's governmental immunity statute, M.C.L. §691.1407(2).  There is no merit to this assertion.  It is well settled that "an individual employee's intentional torts are not

shielded by [Michigan's] governmental immunity statute." *Sudul v City of Hamtramck*, 221 Mich. App. 455, 458 (1997). *See also Lavey v Mills,* 248 Mich. App. 244, 257 (2001). Therefore, the Court will consider each of Plaintiff's state law claims.

### i.     Assault and Battery (Count I)

"An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 189 Mich. App. 110, 119 (1991); *Smith v Tolberg*, 231 Mich. App. 256, 260 (1998). "A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.*

There is no evidence that, prior to the alleged attack, Romita or Sywak threatened Plaintiff or otherwise alluded to an imminent battery. Therefore, Plaintiff has not raised a question of fact with regard to his claim of assault. However, for the reasons stated with regard to Plaintiff's claim of excessive force, he has presented sufficient evidence that he suffered a battery at the hands of Romita and Sywak. Defendants Romita and Sywak's motion for summary judgment on Plaintiff's claim of assault is granted; their motion on Plaintiff's claim of battery is denied. Because there is no evidence of an assault or battery by Defendant Oke, his motion for summary judgment is granted on both claims.

### ii.     Intentional Infliction of Emotional Distress (Count VI)

Plaintiff alleges intentional infliction of emotional distress ("IIED") against all of

the Defendants. To state a claim for IIED, Plaintiff must prove: (1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.' *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985). Defendants contend that Plaintiff has not established either that their alleged acts were "extreme and outrageous" or that he suffered "severe emotional distress."

Quoting Comments following the Restatement Torts 2d §46, the *Roberts* court described the element of extreme and outrageous conduct as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

422 Mich. at 603 (quoting Restatement Torts 2d §46, Comment (d)). "Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them." *Bhama v Bhama*, 169 Mich. App. 73, 80 (1988). For instance, the extreme and outrageous character of a defendant's conduct may arise when a defendant abuses a relationship which puts him in a position of actual or apparent authority over plaintiff or gives the defendant power to affect plaintiff's interests. *Warren v June's Mobile Home Village & Sales, Inc.,* 66 Mich. App. 386, 391 (1976).

Again quoting the Restatement, the *Roberts* court described the severe emotional distress requirement as follows:

> [Emotional distress] includes all highly unpleasant mental reactions,

16

> such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. (*emphasis in original).

*Roberts*, 422 Mich. at 609 (quoting Restatement Torts 2d §46, Comment (j)). Seeking and receiving medical treatment is not a condition precedent. *McCahill v Commercial Union Ins. Co*, 179 Mich. App. 761, 771 (1989).

In this case, reasonable jurors could find that Defendants' use of their authority and control over Plaintiff to inflict an unprovoked beating (which Oke facilitated by giving Romita and Sywak access to Plaintiff) is sufficiently "extreme and outrageous." However, Plaintiff did not present any evidence that he suffered "severe emotional distress." Plaintiff stated in his brief that his medical records confirm that he was treated for several months for severe mental stress and anxiety. Pl. br. at p. 18. However, Plaintiff did not attach those records (or any other evidence) to his response brief. FRCP 56(e) states that "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Plaintiff failed to make even a minimum showing of severe emotional distress and it cannot be presumed. Therefore, Defendants' motion is granted.

### iii. Concert of Action and Civil Conspiracy (Counts II and III)

Under Michigan law, a plaintiff cannot sustain a claim of either concert of action

or conspiracy without establishing an underlying tortious act.  *See Admiral Ins.*, 194 Mich. App. at 359; *Early Detection*, 157 Mich. App. at 632; *Cousineau v Ford Motor Co.,* 140 Mich. App. 19, 37 (1985).

To establish concert of action, a plaintiff must show "that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed."  *Able v Eli Lilly and Co.,* 418 Mich. 311, 338 (1984).  "Express agreement is not necessary, and all that is required is that there be a tacit understanding."  *Cousineau*, 140 Mich. App. at 32 (*quoting* Prosser, Torts (4th ed.), §46, 292).

A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means.  *Admiral Ins. Co. v Columbia Casualty Ins. Co.,* 194 Mich. App. 300, 358 (1992).  "Conspiracy entails 'an agreement, or preconceived plan, to do an unlawful act.'"  *Cousineau*, 140 Mich. App. at 37 (*quoting Bahr v Miller Bros. Creamery*, 365 Mich. 415, 427 (1961).

Plaintiff asserts that the underlying torts were the alleged assault, battery and excessive use of force.  It is not clear that the alleged excessive force in violation of federal law can be considered a tort for purposes of these claims.  However, as stated above, Plaintiff presented evidence of a battery, which is a recognized tort, by Defendants Romita and Sywak.  For the reasons outlined with regard to Plaintiff's §1985(3) claim, there is also sufficient evidence that Romita and Sywak acted in concert to restrain and beat Plaintiff.  Therefore, Plaintiff met his burden against Romita and Sywak on both claims.

Plaintiff has not, however, met his burden with respect to Defendant Oke.  As

already stated, Plaintiff failed to establish assault, battery or excessive force by Oke. Therefore, there is no underlying tort to support either concert of action or civil conspiracy. Plaintiff, nevertheless, contends that Oke is liable because he gave Romita and Sywak access by unlocking the doors to the "D" area and Plaintiff's cell. However, Plaintiff has not demonstrated that these alleged actions by Oke constitute an actionable tort, and it is clear under Michigan law that Plaintiff cannot proceed on either claim without evidence of an underlying tort.

Defendants Romita and Sywak's motion for summary judgment is denied. Defendant Oke's motion is granted.

## V. CONCLUSION

Defendants' Romita and Sywak's motion is **GRANTED** on Plaintiff's claims of assault (Count I) and intentional infliction of emotional distress (Count IV). Their motion is **DENIED** on Plaintiff's claims of battery (Count I), concert of action (Count II), civil conspiracy (Count III), violation of 42 U.S.C. §1983 (Eighth Amendment)(Count V), and conspiracy in violation of 42 U.S.C. §1985(3)(Count VI). Trial will proceed against these two Defendants on these Counts.

Defendant Oke's motion is **GRANTED** on Plaintiff's claims of assault and battery (Count I), concert of action (Count II), civil conspiracy (Count III), intentional infliction of emotional distress (Count IV), and violation of 42 U.S.C. §1983 (Eighth Amendment)(Count V). It is **DENIED** on Plaintiff's claim of conspiracy in violation of 42 U.S.C. §1985(3)(Count VI). Trial will proceed against Oke on this claim of conspiracy only.

**IT IS SO ORDERED.**

                                           **s/Victoria A. Roberts**
                                           **Victoria A. Roberts**
                                           **United States District Judge**

**Dated: April 7, 2006**

> **The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on April 7, 2006.**
>
> **s/Carol A. Pinegar**
> **Deputy Clerk**